**Emily Rena-Dozier, OSB #134674**
erenadozier@oregonlawcenter.org
Oregon Law Center
494 State St., Suite 410
Salem, OR 97301
Phone: (503) 480-1586
Fax: (503) 586-0037

**Emily Teplin Fox, OSB #121720**
efox@oregonlawcenter.org
**Edward Johnson, OSB #965737**
ejohnson@oregonlawcenter.org
Oregon Law Center
522 SW Fifth Ave., Suite 812
Portland, OR 97204
(503) 473-8314
Fax: (503) 295-0676

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| HEATHER HUFF and JESSICA SEGURA, | Case No. 6:17-cv-00223-JR |
| Plaintiffs, | FIRST AMENDED COMPLAINT |
| v. | Civil Rights Action (42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution) |
| MARION COUNTY HOUSING AUTHORITY, a public body corporate and politic; and SHELLY WILKINS-EHENGER, an individual, | |
| | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiffs bring this complaint against the Marion County Housing Authority and its

former Director, Shelly Wilkins-Ehenger, alleging as follows:

---

1 – FIRST AMENDED COMPLAINT

**INTRODUCTION**

This is a case about a housing authority, the Marion County Housing Authority ("MCHA"), that consistently fails to abide by constitutional provisions, federal regulations, or its own Administrative Plan in its administration of the U.S. Department of Housing and Urban Development's ("HUD") Housing Choice Voucher ("HCV") Program. It is also a case about an individual, Shelly Wilkins-Ehenger, who as MCHA's Director persistently refused to ensure that the programs she administered complied with due process standards and took affirmative steps to deny HCV Program participants access to benefits to which they were entitled.

The HCV Program provides vouchers that enable low-income families to afford housing in the private rental market. A voucher is often the single most valuable asset that a low-income family will ever have. The vouchers cover the difference between 30% of a participant family's income and market rent. The HCV Program thus makes quality housing available to low-income families who otherwise could not afford market rents. If a participant family loses its voucher, the family is immediately at significant risk of homelessness.

Defendants have administered and are administering the HCV Program unlawfully in two aspects. First, as the name "Housing Choice Voucher" suggests, the vouchers' portability is fundamental to the program. Federal regulations require that housing authorities allow HCV participant families to move with continued assistance within a housing authority's district or to port their voucher to another housing authority's district. Despite these requirements, MCHA employs a policy of denying or refusing to respond to requests for move vouchers (both moves with continued assistance within the district as well as ports outside the district) until after families move out of their current dwelling. As a result, families whose vouchers are

administered by MCHA are denied the choice in housing that is the hallmark of the HCV Program. Further, Defendants' refusal to timely respond to requests for move vouchers results in a gap between the conclusion of one tenancy and the beginning of the next, compelling participant families to undergo periods of homelessness while searching for new housing.

Second, federal law requires that voucher holders be afforded due process, including notice and an opportunity to be heard, before they are terminated from the HCV Program. Defendants, however, have consistently failed to ensure that MCHA employees provide even minimally adequate notices to HCV program participants, resulting in a practice that does not provide constitutionally required due process prior to terminating participant families from the HCV Program. During Ms. Wilkins-Ehenger's tenure as Director of MCHA, notices have typically failed to specify a factual cause for termination. The notices also typically fail to provide the required notice period between the date of the notice and the date on which the family is to be terminated from the HCV Program. Indeed, over a third of the participant families that Defendants terminated in 2016 did not receive a notice of termination until *after* the effective date of the termination. As a result, the approximately 900 families who have depended and continue to depend on Defendants' administration of the HCV program for their housing — households comprised primarily of single parents, children, senior citizens and the disabled — are at risk of losing their vouchers without adequate notice or an opportunity to contest the termination.

In short, Defendants, with a mission dedicated to helping low-income families achieve stable housing and self-sufficiency, have instead developed and used policies and practices that force low-income families onto the streets.

Plaintiffs Heather Huff and Jessica Segura are HCV Program participants in Marion

County who have been harmed by, and face imminent further harm from, Defendants' unlawful conduct. They seek to compel MCHA to follow the law in its administration of the HCV Program. Ms. Huff also seeks compensatory damages for the harm that she endured as a result of Defendants' unlawful policies and practices.

## I. JURISDICTION AND VENUE

1.1     This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because plaintiffs' claims arise under the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

1.2     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the claims alleged herein arose in this district and all plaintiffs are residents of this district.

## II. PARTIES

2.1     Heather Huff is the head of her household; her family consists of herself, her husband, and her three minor children. Her family currently participates in the HCV program as administered by MCHA.

2.2     Jessica Segura is the head of her household; her family consists of herself and her two minor children. Her family currently participates in the HCV program as administered by MCHA.

2.3     Defendant MCHA is, and at all times material to this dispute has been, funded by HUD to provide housing to low-income individuals in Marion County who reside outside the urban growth boundary of the city of Salem. MCHA is administered by the Marion County Housing Authority Board of Directors, which is comprised of the Marion County Board of

Commissioners. Among other services, MCHA manages the HCV Program for Marion County.

2.4     Defendant Shelly Wilkins-Ehenger was at all times material to this dispute the Director of MCHA and the Director of MCHA's Housing Choice Voucher Program. The Director works under the direction and policy guidance of the Marion County Housing Authority Board of Directors. The Director is responsible for overseeing day-to-day operations of MCHA, hiring and directing staff, and directing the management of MCHA programs to ensure compliance with funding requirements and state and federal statutes, rules, and regulations.

2.5     Ms. Wilkins-Ehenger has extensive experience with the constitutional and regulatory requirements of HUD programs, including the HCV Program. She was the Director of the Metropolitan Housing Alliance, the public housing authority in Little Rock, Arkansas until 2012, and had been employed by that agency for approximately 17 years prior to her departure. She was the Director of MCHA from 2013 until February of 2017.

2.6     On information and belief, MCHA does not currently have a Director.

### III. FACTUAL ALLEGATIONS

**A.  Defendants Must Provide Move Vouchers Within 20 Days and Afford Due Process Before Terminating a HCV Program Voucher**

3.1     HUD provides funding to MCHA to operate the HCV Program in rural Marion County. Under its contract with HUD, MCHA agrees to operate the HCV Program in compliance with federal statutes, regulations, and MCHA's Administrative Plan, which is submitted to HUD for approval.

3.2     A hallmark of the HCV program is the vouchers' portability. The vouchers are not tied to a particular dwelling, which means that families continue to receive rental assistance when they relocate from one dwelling to another.

3.3     There are myriad reasons a participant family may need to move their home and request a move voucher from MCHA. As a few examples, participant families may need to move because of domestic violence, because of a job opportunity, or because their landlord has issued a no-cause notice.

3.4     Typically, a family will request a move voucher after they decide to terminate their rental agreement or after they receive a notice of termination from their landlord. Tenants must vacate their dwelling on or before the termination date stated in the notice or risk a legal eviction. If a family fails to secure a new dwelling prior to the termination date of their current tenancy, the family must either move in with friends or family, seek out space in a homeless shelter, or move into the family vehicle.

3.5     Federal regulations provide that participant families may move to another dwelling within a housing authority's district while retaining their voucher at least once per year at any time after the first year of tenancy. *See* 24 C.F.R. § 982.354.

3.6     Federal regulations also provide that participant families may port their voucher to a housing authority outside their current housing authority's district. Regulations further require that such requests to port outside the district be administered "promptly." *See* 24 C.F.R. § 982.353(b) and § 982.355(c).

3.7     MCHA's Administrative Plan provides that eligible voucher-holders who request permission to move within the district will receive a move voucher within 20 days of request.

3.8     MCHA's Administrative Plan also provides that eligible voucher-holders who request permission to port their voucher outside the district will receive a voucher "within 10 business days of the effective date of the unit termination."

3.9     Vouchers are, for many low-income families whose households benefit from a

HCV Program, the most valuable thing they own. Many such families would be rendered homeless without a voucher.

3.10    In recognition of the valuable property right conferred by a voucher, the Fourteenth Amendment to the United States Constitution, as well as federal regulations, require housing authorities such as MCHA to provide HCV participant families with due process before they are terminated from the HCV Program. This clearly established right to due process includes a right to constitutionally adequate notice and an opportunity to be heard. *See* 24 C.F.R. § 982.555(c).

3.11    Federal regulations provide that housing authorities may terminate families from the HCV Program only for causes specified by federal regulations. *See* 24 C.F.R. § 982.552.

### B.  <u>Defendants Routinely Violate Due Process in Responding to Requests to Move</u>

3.12    At all relevant times, Defendants administered, and Defendant MCHA continues to administer, vouchers for a group of approximately 900 participant families in Marion County. Participant families are entitled to move with continued voucher assistance or to port to another district after their first year of tenancy. Participant families are also entitled to due process protections before they are terminated from the HCV Program. But participants are currently at risk of having their freedom to move arbitrarily denied by MCHA's policy of refusing to supply move vouchers until after the family vacates their current rental unit.

3.13    In July and August of 2016, Defendant Wilkins-Ehenger stated to Plaintiff Huff's prior counsel that MCHA's policy was to withhold move vouchers from participant families until after the families vacated their current dwelling. Ms. Wilkins-Ehenger explained that waiting to respond to voucher requests until after participants moved out of their current housing allowed

MCHA to determine whether the participant family had damaged the dwelling or incurred debts to the landlord during the tenancy. If so, MCHA could terminate the participant family from the HCV Program rather than providing them with a move voucher.

3.14    No such policy is included in MCHA's Administrative Plan; indeed, the Plan states that MCHA will respond to requests for move vouchers within the district in no more than 10 business days.

3.15    Ms. Wilkins-Ehenger has subsequently denied that she or MCHA maintained such a policy.

3.16    In 2016, Defendants received approximately 49 requests for move vouchers (both within and outside the district). Of those 49 requests, Defendants eventually provided vouchers to 36 of the participant families that would allow the families either to move within the district or to port to another district.

3.17    In its responses to 24 of the completed requests — approximately 66% — Defendants issued a move voucher after the termination date of the previous tenancy. Defendants issued a voucher on the same day that the tenancy terminated in response to 3 — approximately 8% — of the requests. As a consequence, the 24 families could not secure a new dwelling until they had already vacated their previous dwelling.

3.18    In 2016, therefore, Defendants denied three quarters of the participant families who requested move vouchers the ability to search for a new home until after they had moved out of their current home.

3.19    As Director of MCHA, Ms. Wilkins-Ehenger provided final approval for all move vouchers during her tenure at MCHA.

3.20    As a result of Defendants' policy, the majority of participant families would be

without stable housing between the conclusion of one tenancy and the beginning of another. Only 25% of requests for move vouchers in 2016 were honored prior to the date on which the participant families were required to move out of their current rental unit.

3.21    Ms. Wilkins-Ehenger has stated that the rental vacancy rate in rural Marion County is less than 1%. The low vacancy rate means that participant families experience significant difficulty in locating new dwellings. Ms. Wilkins-Ehenger has stated that, of the 700 vouchers issued in 2015, fewer than 200 participant families were able to find a place to live. Accordingly, MCHA's policy of delaying issuing move vouchers until after tenants move out significantly increases the risk that participant families like Ms. Huff and Ms. Segura will suffer homelessness, a risk that was known to Ms. Wilkins-Ehenger.

3.22    As noted above, MCHA's Administrative Plan states that MCHA will respond to requests for move vouchers within the district in no more than 10 business days, will issue vouchers within 20 business days, and will fulfill requests to port outside the district within 10 business days.

3.23    In 2016, Defendants issued half of the requested vouchers more than 20 business days after they were requested. Some participant families waited more than 60 business days before receiving their move vouchers.

3.24    In all, in 2016 Defendants failed to provide 24 participant families with move vouchers prior to termination of their tenancies. Ms. Huff's family was one of those 24 families. Defendants also failed to provide 18 participant families with vouchers within the 20 business days specified by MCHA's Administrative Plan. Ms. Huff also was not provided with a voucher within 20 days.

3.25    The move request statistics for 2016 indicate that Defendants refused to provide

move vouchers prior to the termination of a tenancy approximately 75% of time.

3.26     These statistics show that, consistent with the oral statement of Ms. Wilkins-Ehenger, Defendants have in fact pursued a policy or practice of refusing to provide move vouchers to participant families until after the families vacate their current rental, a policy or practice that MCHA continues to pursue.

## C.  Defendants Routinely Violate Due Process in Issuing Notices of Termination

3.27     Termination notices are issued by individual MCHA caseworkers, who were supervised by Ms. Wilkins-Ehenger during her tenure as Director of MCHA. Ms. Wilkins-Ehenger reviewed notices issued by caseworkers and on occasion issued notices that carried her own signature.

3.28     In 2016, MCHA caseworkers issued notices of termination from the HCV Program to 33 participant families based on allegations that family members had violated MCHA rules or federal regulations. Eleven notices did not provide 30 days' notice prior to termination as required by MCHA's Administrative Plan; one did not specify a reason for the termination (other than a recital of the number of the rules alleged to have been violated); and eleven failed to provide an adequate reason or an adequate notice period.

3.29     Accordingly, MCHA caseworkers failed to provide even minimal due process protections in approximately 69% of the termination notices that MCHA issued in 2016.

3.30     Of the notices that failed to provide an adequate notice period, twelve were issued after the date the termination became effective. Eight took effect before the expiration of the ten business days provided for participant families to request a hearing prior to the termination. Accordingly, twenty of the families terminated from the HCV Program in 2016 —

approximately 60% — were effectively denied the opportunity to request a hearing prior to their termination.

3.31    In addition, twelve of the notices failed to specify a factual reason for the termination (other than a reference to the number of the rule alleged to have been broken) or to supply a date on which the alleged violations occurred. As a result, 36% of the families terminated from the HCV Program in 2016 were denied the opportunity to meaningfully challenge their terminations because they had no way of knowing the factual basis for the allegations.

3.32    The termination statistics for 2016 indicate that Defendants failed to provide adequate notice and an opportunity to be heard approximately 69% of the time. These statistics show a consistent policy or practice whose effect is to deny due process to participant families when attempting to terminate families from the HCV Program.

3.33    Based on Defendants' actions in 2016, participant families, including Ms. Huff and Ms. Segura, remain at risk of being terminated from the HCV Program without an opportunity to contest the termination.

### D.  Defendants' Denials of Due Process to Heather Huff and Risk of Future Denial

3.34    Heather Huff is the head of her household. Her family has participated in the HCV Program since 2002.

3.35    From 2010 to 2016, Ms. Huff rented a duplex in Stayton, Oregon.

3.36    In March 2016, Ms. Huff's landlord sent her and MCHA a notice terminating Ms. Huff's tenancy without cause effective May 20, 2016. The landlord informed Ms. Huff that he was terminating Ms. Huff's tenancy in order to extensively remodel the unit.

3.37    Ms. Huff contacted MCHA to request a move voucher on April 25, 2016. MCHA staff informed Ms. Huff and her landlord that Ms. Huff's tenancy could not be terminated without cause. This was untrue. Ms. Huff's tenancy was month to month and therefore could be terminated without cause by either landlord or tenant.

3.38    MCHA staff did not respond to Ms. Huff's request for a move voucher in writing as provided by MCHA's Administrative Plan.

3.39    In response to MCHA's claim that the landlord could not terminate Ms. Huff's tenancy without cause, the landlord issued Ms. Huff a notice of termination for cause effective June 9, 2016.

3.40    On June 1, 2016, MCHA staff issued Ms. Huff a notice stating that her family would be terminated from the HCV Program effective June 9, 2016. The notice was titled "Notification of Move Out" and consisted of a series of boxes to be checked by MCHA staff. MCHA staff checked the box for "MCHA TERMINATION OF PROGRAM PARTICIPATION." The sole reason provided for termination was "DUE TO EVICTION BY LANDLORD." As of June 1, 2016 (or June 9, 2016), Ms. Huff's landlord had not evicted her.

3.41    A housing authority may terminate a family's participation in the HCV Program only for reasons specified in 24 C.F.R. 982.552 or 982.553. A landlord's decision to terminate a tenancy is not sufficient cause for a housing authority to terminate a participant family from the HCV Program unless the housing authority determines that the landlord's reasons for terminating the tenancy constitute "serious or repeated lease violations."

3.42    The June 1, 2016 notice did not state any serious or repeated lease violations as cause for termination.

3.43    The notice also stated that Ms. Huff could inquire about the reason for her

termination, and that she could request a hearing to dispute the termination within ten business days of the date of the notice. The ten business days provided by the notice gave Ms. Huff until June 15, 2016 to request a hearing prior to the termination. However, the June 9, 2016 effective date of the termination occurred nearly a week before Ms. Huff's opportunity to request a hearing prior to termination expired.

3.44    On June 1, 2016, Ms. Huff requested a hearing from MCHA on its decision to terminate her from the HCV Program. On June 2, 2016, after reviewing the June 1 notice, Ms. Wilkins-Ehenger sent an email to Ms. Huff's MCHA caseworker instructing the caseworker that Ms. Huff could not be terminated from the HCV Program until she was legally evicted.

3.45    Ms. Wilkins-Ehenger did not inform the caseworker that the notice period provided in the June 1, 2016 notice was insufficient or that eviction was not a sufficient cause for termination from the HCV Program unless the eviction was for a serious violation of the lease.

3.46    On June 13, 2016, Ms. Huff's landlord filed an eviction complaint. On June 21, 2016, Ms. Huff stipulated to an agreement with her landlord that she would move out on or before July 15, 2016 in return for dismissal of the eviction complaint. Ms. Huff complied with the stipulated agreement. Accordingly, Ms. Huff was not evicted.

3.47    On July 6, 2016, MCHA staff issued another notice of termination to Ms. Huff, this time with an effective date of July 15, 2016. The ten-day window for requesting a hearing on this notice would not expire until July 20, 2016.

3.48    The July 6 notice stated as cause for termination from the HCV Program "Violation of Family Obligations, see below." In another section, the notice listed four numbered family obligations (numbers 7, 9, 13, and 16) but did not explain how or when Ms. Huff had allegedly violated those obligations.

3.49     On July 13, 2016, Ms. Huff, through her then-counsel, sent a letter to MCHA via fax and first class mail, disputing the July 6 termination and requesting a hearing.

3.50     On July 19, 2016, Ms. Wilkins-Ehenger sent an email to Ms. Huff's caseworker stating that "Her attorney is seeking information and I have to provide information that is based upon our policies."

3.51     Ms. Wilkins-Ehenger did not inform the caseworker that the notice provided an insufficient period to request a hearing or that the notice did not provide a sufficient cause for termination.

3.52     Neither Ms. Wilkins-Ehenger nor the MCHA caseworker ever responded to the July 13 letter from Ms. Huff's counsel.

3.53     Neither Ms. Wilkins-Ehenger nor the MCHA caseworker scheduled a hearing for Ms. Huff.

3.54     Neither Ms. Wilkins-Ehenger nor the MCHA caseworker provided Ms. Huff with the move voucher she had been requesting since April 25, 2016.

3.55     Ms. Wilkins-Ehenger orally informed Ms. Huff's then-counsel that MCHA's policy was to withhold move vouchers until a participant family's landlord had confirmed that the rental unit had not been damaged and that tenants owed no balance to the landlord. No such policy is stated in MCHA's Administrative Plan.

3.56     Ms. Huff vacated her rental unit on July 15, 2016.

3.57     Because she had not received a move voucher, Ms. Huff could not afford housing. Ms. Huff's family therefore became homeless.

3.58     Ms. Huff sent her children to live with her parents in another town while Ms. Huff slept on friends' couches or in her car.

3.59    After she became homeless, Ms. Huff lost her job because she was unable to sleep regular hours or bathe regularly.

3.60    On August 8, 2016, Ms. Huff's then-counsel sent another letter to Ms. Wilkins-Ehenger, again by fax and mail. Ms. Huff's counsel informed Ms. Wilkins-Ehenger that Ms. Huff's family was now homeless and renewed Ms. Huff's request for a move voucher.

3.61    Defendants provided no written response to Ms. Huff or her counsel.

3.62    On September 22, 2016, the Oregon Law Center contacted Defendants to protest Defendants' policy of denying move vouchers to participant families until they moved out of their rental units. The letter stated that the policy did not comply with federal regulations or MCHA's Administrative Plan and demanded that Defendants immediately cease from enforcing the policy, retrain their employees, and provide move vouchers to all eligible participant families who had requested them.

3.63    On October 10, 2016, Ms. Wilkins-Ehenger issued a move voucher to Ms. Huff. This was 117 business days after Ms. Huff's initial request, and almost 3 months after she had vacated her previous unit.

3.64    At no time have Defendants explained their actions or the delay.

3.65    Defendants never held the requested hearing on Ms. Huff's termination from the HCV Program, but no further steps were taken to terminate Ms. Huff's assistance on the basis of the July 6, 2016 termination notice.

3.66    Because of Defendants' actions, Ms. Huff has been subjected to fear, stress, humiliation, and frustration in her ongoing efforts to secure stable, affordable housing for her family.

3.67    Defendants' refusal to provide Ms. Huff with a move voucher caused Ms. Huff

and her family to become homeless, which in turn caused Ms. Huff to lose her job. Ms. Huff lost

income, and incurred costs associated with lost belongings in the upheaval following her loss of

housing.

3.68    Defendants' refusal to provide Ms. Huff with a move voucher also caused Ms.

Huff to be separated from her children for almost six months. This experience was devastating

for Ms. Huff. She feared that she would never be reunited with her children and have the

opportunity to live as a family. She also feared that the separation would cause the children

emotional and psychological harm and felt that she had failed to be a good mother to her

children. As a result, Ms. Huff experienced severe emotional harm including depression, fear,

anxiety, and sleeplessness.

3.69    As set forth above, Ms. Huff's experience requesting a move voucher from

Defendants was not unique. Defendants have employed a policy or practice of refusing to timely

issue move vouchers, with the predictable result that participant families experience housing

instability and as a result risk homelessness, loss of employment, family break-up, and physical

harm.

3.70    If Ms. Huff's new landlord issues a no-cause notice terminating her tenancy, as

her prior landlord did, Ms. Huff will once again be subject to Defendant MCHA's policy or

practice of mishandling and refusing to issue a move voucher and once again at risk of

significant harm as a result of Defendant MCHA's policy or practice.

3.71    Likewise, Defendant MCHA has a policy or practice of issuing termination

notices, like those received by Ms. Huff, that do not afford participant families due process.

3.72    Ms. Huff also lives with the threat that Defendant MCHA will again attempt to

terminate her from the HCV Program without providing notice or an opportunity to request a

hearing prior to termination.

3.73    As a result, Ms. Huff lives under constant threat of homelessness and separation

from her family. She fears homelessness and family separation daily.


**E.  MCHA's Denials of Due Process to Jessica Segura and Risk of Future Denial**

3.74    Jessica Segura is a single mother and the head of her household. She has

participated in the HCV Program since July of 2016. Ms. Segura currently rents an apartment in

Turner, Oregon.

3.75    On October 27, 2016, Ms. Segura received a notice of termination from her

landlord. The notice stated two causes for termination, and provided that if Ms. Segura cured

both issues by November 13, 2016, her rental agreement would not terminate.

3.76    On November 2, 2016, MCHA staff sent Ms. Segura a "Notification of Move

Out." The notice contained several boxes. MCHA staff had checked the boxes for "EVICTION

PER LANDLORD" and "MCHA TERMINATION OF PROGRAM PARTICIPATION." The

notice stated the following for "Termination Reason": "Violation of Family Obligations:

'Commit any serious or repeated violation of the lease.' Per your landlord, our office received

the following lease violation notices: Unauthorized Occupants(s) (see attached #1 and #2), Pet

Violation (# 3, 4, 5, & 6) and a 30-day notice to vacate (#7)."

3.77    The notice did not state the dates on which the alleged violations had occurred or

specify in any more detail what the alleged violations had consisted of. In addition, the notice did

not acknowledge that Ms. Segura's tenancy would not terminate if she resolved the issues with

her landlord.

3.78    Ms. Segura's notice was inadequate and failed to provide Ms. Segura with a

meaningful opportunity to challenge the basis of the termination. After receiving the notice, Ms. Segura was unable to determine what cause or causes Defendants were asserting as reasons for terminating her participation in the HCV Program. Had a hearing been necessary, Ms. Segura would have been unable to adequately prepare a defense, as she had not received adequate notice of the specific program violations of which Defendants accused her or the dates or times on which the supposed violations had taken place.

3.79    Ms. Segura cured one of the alleged violations and clarified with her landlord that the other violation was not, in fact, a violation of the rental agreement. Accordingly, the landlord agreed that Ms. Segura's tenancy would not terminate.

3.80    After the landlord agreed that Ms. Segura's tenancy would not terminate, Defendants agreed to withdraw the termination of Ms. Segura's voucher.

3.81    As a result of Defendants' insufficient notice, Ms. Segura suffered fear, stress, anxiety, and sleeplessness. She fears that, if Defendant MCHA again attempts to terminate her from the HCV Program, she will be unable to determine the cause for the determination and be unable to prepare a factual defense.

3.82    As set forth above, Defendants have employed a practice or policy of failing to provide adequate notices of termination from the HCV Program or an opportunity to challenge such termination.

3.83    If Ms. Segura again receives a wrongful notice-and-cure notice from her landlord, she will be in danger of losing her HCV Program voucher without adequate notice or an opportunity to be heard.

## IV. Plaintiffs Attempted to Resolve this Matter Prior to Litigation

4.1     The Oregon Law Center contacted Defendants in September of 2016 to protest MCHA's policy of denying move vouchers until after participant families vacated their current rental.

4.2     Plaintiffs' counsel contacted Defendants again on January 24, 2017, providing a draft of this complaint and providing notice of potential litigation.

4.3     Despite these efforts, the parties have not been able to resolve their dispute.


## FIRST CLAIM FOR RELIEF
### Fourteenth Amendment to the U.S. Constitution (Procedural Due Process) and 42 U.S.C. § 1983

5.1     Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

5.2     Because a voucher is a valuable property right, the due process clause and federal regulations require that housing authorities provide notice and an opportunity to be heard to HCV Program participants prior to terminating them from the HCV Program.

5.3     The due process requirements for terminations are clearly established in federal statutes and regulations.

5.4     Defendants' practice of issuing notices of termination that (a) do not clearly identify that they are notices of termination from the HCV Program; (b) do not state a factual cause for termination; and (c) do not state a date or time on which any alleged violation of program rules occurred fails to provide procedural due process before depriving participant families of a property right. Families who receive such notices are not reasonably apprised of the cause for the state action and therefore have no opportunity to prepare a defense against the

deprivation.

5.5     Defendants' practice of issuing notices of termination after the effective date of the termination deprives participant families of a property right without due process because families who receive such notices are denied the opportunity to be heard prior to the deprivation.

5.6     Defendants' practice of issuing notices of termination with effective dates that fall prior to the expiration of the 10 business days provided in which to request a hearing deprives participant families of a property right without due process because families who receive such notices are denied the opportunity to be heard prior to the deprivation.

5.7     Defendants' practice of refusing to issue move vouchers until after participant families vacate their dwellings effectively deprives participant families of a property right without due process because families are denied the opportunity to move without being afforded notice of that denial or an opportunity to contest the denial through a hearing.

5.8     Plaintiffs have a real and immediate threat of injury without injunctive relief. If MCHA decides to terminate them from the HCV Program, MCHA's policies and practices mean that plaintiffs will likely not be informed of the cause for the termination or provided with an opportunity to be heard prior to the termination. Similarly, if in the future MCHA chooses to withhold a move voucher, as it did for Ms. Huff, plaintiffs will have no opportunity to challenge MCHA's decision.

5.9     Plaintiffs are entitled to injunctive and declaratory relief, as set forth below.

5.10    Plaintiffs are entitled to their reasonable costs and attorney fees on this claim pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF:**
**Fourteenth Amendment to the U.S. Constitution (Substantive Due Process)**
**and 42 U.S.C. § 1983**

6.1     Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

6.2     The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

6.3     Federal regulations require that HCV Program participants be provided the freedom to choose where they live and the liberty to move from dwelling to dwelling while retaining the valuable property right secured by the participant family's voucher.

6.4     By refusing to respond to participant families' requests for move vouchers until after families move out of their dwellings, Defendants have knowingly placed, and continue to place, participant families at substantial risk of becoming homeless and the serious harm — including threats to physical safety, as well loss of property and income — associated with homelessness. Defendants' policy poses an objective threat to participant families' fundamental rights to physical safety and security, to the liberty to choose where they live, and to property and income.

6.5     Any reasonable official would be aware of the substantial risk of homelessness created by Defendants' policy of denying move vouchers to participant families until after they vacate their dwellings. In particular, any reasonable official whose agency is tasked with providing housing to low-income families would be aware of the risks to physical health and safety, emotional wellbeing, and financial stability posed by a loss of housing.

6.6     Defendants were aware of the low rental vacancy rates in Marion County and of

the difficulty that participant families experience when attempting to find new housing. Defendants have nonetheless pursued a policy that has the objectively predictable result of rendering families homeless.

6.7     Ms. Wilkins-Ehenger persisted in her refusal to respond to Ms. Huff's repeated requests for a move voucher, even after being informed that Ms. Huff's family was homeless as a consequence of Defendants' failure to act. Only after receiving notice in September 2016 that litigation could result from Defendants' actions did Ms. Wilkins-Ehenger issue a move voucher to Ms. Huff.

6.8     Defendants have acted with deliberate indifference or reckless disregard to the rights of participant families in employing the above-described policy.

6.9     No reasonable justification or legitimate governmental objective exists for Defendants' policy of refusing, in violation of MCHA's Administrative Plan, to provide move vouchers to families who request them.

6.10    Defendants' employment of a policy that places all participant families who exercise their right to move at significant risk of homelessness and the risks of harm associated with homelessness shocks the conscience. This policy violates participant families' rights to substantive due process as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6.11    The due process clause also requires that HCV Program participants receive notice and the opportunity to be heard before they are terminated from the HCV Program. Families who are terminated without notice lose the opportunity to contest the basis for their terminations.

6.12    MCHA staff habitually issue termination notices that do not comport with due

process, either because the notices lack a specified cause for termination, an adequate time period in which to request a hearing, or both. As a consequence, a significant proportion of participant families are terminated from the HCV Program without being afforded due process by Defendants.

6.13    Ms. Wilkins-Ehenger was aware of the deficiencies of termination notices issued by MCHA staff. Despite this awareness, Ms. Wilkins-Ehenger failed to take adequate steps to prevent or correct MCHA staff's failure to comply with due process requirements.

6.14    Defendants have represented that MCHA has no training policies or manuals other than its Administrative Plan.

6.15    Defendants' knowing failure to adequately train or supervise its staff to ensure that participant families' due process rights will be safeguarded when MCHA takes steps to terminate the families from the HCV Program amounts to a policy of deliberate indifference to those rights. Defendants' deliberate indifference to staff conduct that is substantially certain to result in the deprivation of due process to participant families shocks the conscience. Defendants' failure to train its staff violates participant families' rights to substantive due process as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6.16    Plaintiff Huff suffered economic and emotional harm because of defendants' ongoing violations of her rights to substantive due process, including fear, humiliation, anxiety, depression, and sleeplessness, as well as lost wages, lost property, and other expenses associated with homelessness.

6.17    Plaintiffs have a real and immediate threat of injury without injunctive relief. If they choose to exercise their right to move to another dwelling, they are likely to be denied a

move voucher and thereby suffer future harm.

6.18    Plaintiffs are entitled to injunctive and declaratory relief, as set forth below.

6.19    Plaintiffs are entitled to their reasonable costs and attorney fees on this claim
pursuant to 42 U.S.C. § 1988.

## V. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for:

1. A declaration that Defendants' acts and omissions violated and continue to violate the
Fourteenth Amendment to the U.S. Constitution;

2. An injunction requiring Defendants to:

   a.    Immediately cease their policy of withholding move vouchers until after
         participant families vacate their dwellings;

   b.    Provide move vouchers to all eligible participant families within 20 business days
         of request as provided by the MCHA Administrative Plan, or, if MCHA
         determines it has cause to deny the request, issue written notice of the denial and
         inform the participant family of their right to a hearing on the denial;

   c.    Provide constitutionally adequate notices prior to termination of participant
         families from the HCV Program. Notices must state the program rule alleged to
         have been violated, a factual description of the conduct that allegedly violated the
         rule, and must include the date on which the alleged violation occurred. Notices
         must also provide an adequate opportunity for participant families to request a
         hearing prior to the termination.

3. As to plaintiff Heather Huff, an award of damages in an amount to be determined at trial,
but no less than $150,000;

4. An award of reasonable attorney fees, costs and disbursements incurred herein;

5. Prejudgment interest; and

6. Such other and further legal and equitable relief as this Court deems just and proper.



DATED this 7th day of April, 2017.


Respectfully submitted,


<u>s/Emily Rena-Dozier</u>
Emily Rena-Dozier, OSB #134674
emily.rena-dozier@lasoregon.org
Legal Aid Services of Oregon
520 SW 6th Avenue, Suite 700
Portland, OR 97204
(503) 471-1162
Fax: (503) 295-9496

Of Attorneys for Plaintiffs