**Emily Rena-Dozier, OSB #134674**
emily.rena-dozier@lasoregon.org
Legal Aid Services of Oregon
520 SW 6th Avenue, Suite 700
Portland, OR 97204
(503) 471-1162
Fax: (503) 295-9496

**Emily Teplin Fox, OSB #121720**
efox@oregonlawcenter.org
**Edward Johnson, OSB #965737**
ejohnson@oregonlawcenter.org
Oregon Law Center
522 SW Fifth Ave., Suite 812
Portland, OR 97204
(503) 473-8314
Fax: (503) 295-0676

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| HEATHER HUFF and TERRY BLAKELY, | Case No. 6:17-cv-00223-JR |
| Plaintiffs, | SECOND AMENDED COMPLAINT |
| v. | Civil Rights Action (42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution) |
| MARION COUNTY HOUSING AUTHORITY, a public body corporate and politic; and SHELLY WILKINS-EHENGER, an individual, | |
| | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiffs bring this complaint against the Marion County Housing Authority; plaintiff

Huff additionally brings this complaint against the Marion County Housing Authority's former

Director, Shelly Wilkins-Ehenger, alleging as follows:

1 – SECOND AMENDED COMPLAINT

## INTRODUCTION

This is a case about a housing authority, the Marion County Housing Authority ("MCHA"), that consistently fails to abide by constitutional provisions, federal regulations, or its own Administrative Plan in its administration of the U.S. Department of Housing and Urban Development's ("HUD") Housing Choice Voucher ("HCV") Program. It is also a case about an individual, Shelly Wilkins-Ehenger, who as MCHA's Director persistently refused to ensure that the programs she administered complied with due process standards and took affirmative steps to deny HCV Program participants access to benefits to which they were entitled.

The HCV Program provides vouchers that enable low-income families to afford housing in the private rental market. A voucher is often the single most valuable asset that a low-income family will ever have. The vouchers cover the difference between 30% of a participant family's income and market rent. The HCV Program thus makes quality housing available to low-income families who otherwise could not afford market rents. If a participant family loses its voucher, the family is immediately at significant risk of homelessness.

Defendants have administered continue to administer the HCV Program unlawfully in two aspects. First, as the name "Housing Choice Voucher" suggests, the vouchers' portability is fundamental to the program. Federal regulations require that housing authorities allow HCV participant families to move with continued assistance within a housing authority's district or to port their voucher to another housing authority's district. Despite these requirements, MCHA employs a policy of denying or refusing to respond to requests for move vouchers (both moves with continued assistance within the district as well as ports outside the district) until after families move out of their current dwelling. As a result, families whose vouchers are administered by MCHA are denied the choice in housing that is the hallmark of the HCV

Program. Further, defendants' refusal to timely respond to requests for move vouchers results in a gap between the conclusion of one tenancy and the beginning of the next, compelling participant families to undergo periods of homelessness while searching for new housing.

Second, federal law requires that HCV participants be afforded due process, including notice and an opportunity to be heard, before they are terminated from the HCV Program. Defendants, however, have consistently failed to ensure that MCHA employees provide even minimally adequate notices to HCV program participants, resulting in a practice that does not provide constitutionally required due process prior to terminating participant families from the HCV Program. During Ms. Wilkins-Ehenger's tenure as Director of MCHA, notices have typically failed to specify a factual cause for termination. The notices also typically fail to provide the required notice period between the date of the notice and the date on which the family is to be terminated from the HCV Program. Indeed, over a third of the participant families that defendants terminated in 2016 did not receive a notice of termination until *after* the effective date of the termination. As a result, the approximately 900 families who have depended and continue to depend on defendants' administration of the HCV program for their housing — households comprised primarily of single parents, children, senior citizens and the disabled — are at risk of losing their vouchers without adequate notice or an opportunity to contest the termination.

In short, defendants, with a mission dedicated to helping low-income families achieve stable housing and self-sufficiency, have instead developed and used policies and practices that force low-income families onto the streets.

Plaintiffs Heather Huff and Terry Blakely are HCV Program participants in Marion County who have been harmed by, and face imminent further harm from, defendants' unlawful

conduct. They seek to compel MCHA to follow the law in its administration of the HCV Program. Plaintiffs also seek compensatory damages for the harm that they endured as a result of defendants' unlawful policies and practices.

## I. JURISDICTION AND VENUE

1.1    This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because plaintiffs' claims arise under the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

1.2    Venue is proper pursuant to 28 U.S.C. § 1391(b) because the claims alleged herein arose in this district and all plaintiffs are residents of this district.

## II. PARTIES

2.1    Heather Huff is the head of her household; her family consists of herself, her husband, and her three minor children. Her family currently participates in the HCV program as administered by MCHA.

2.2    Terry Blakely is the sole member of her household. She currently participates in the HCV program as administered by MCHA.

2.3    Defendant MCHA is, and at all times material to this dispute has been, funded by HUD to provide housing to low-income individuals in Marion County who reside outside the urban growth boundary of the city of Salem. MCHA is administered by the Marion County Housing Authority Board of Directors, which is comprised of the Marion County Board of Commissioners. Among other services, MCHA manages the HCV Program for Marion County.

2.4    Defendant Shelly Wilkins-Ehenger was at all times material to this dispute the

Director of MCHA and the Director of MCHA's Housing Choice Voucher Program. The

Director works under the direction and policy guidance of the Marion County Housing Authority

Board of Directors. The Director is responsible for overseeing day-to-day operations of MCHA,

hiring and directing staff, and directing the management of MCHA programs to ensure

compliance with funding requirements and state and federal statutes, rules, and regulations.

2.5     Ms. Wilkins-Ehenger has extensive experience with the constitutional and

regulatory requirements of HUD programs, including the HCV Program. She was the Director of

the Metropolitan Housing Alliance, the public housing authority in Little Rock, Arkansas until

2012, and had been employed by that agency for approximately 17 years prior to her departure.

She was the Director of MCHA from 2013 until February of 2017.

2.6     On information and belief, MCHA does not currently have a Director.


### III. FACTUAL ALLEGATIONS

**A.  Defendants Must Provide Move Vouchers Within 20 Days and Afford Due Process Before Terminating a HCV Program Voucher**

3.1     HUD provides funding to MCHA to operate the HCV Program in rural Marion

County. Under its contract with HUD, MCHA agrees to operate the HCV Program in compliance

with federal statutes, regulations, and MCHA's Administrative Plan, which is submitted to HUD

for approval.

3.2     A hallmark of the HCV program is the vouchers' portability. The vouchers are not

tied to a particular dwelling, which means that families continue to receive rental assistance

when they relocate from one dwelling to another.

3.3     There are myriad reasons a participant family may need to move their home and

request a move voucher from MCHA. As a few examples, participant families may need to move

because of domestic violence, because of a job opportunity, or because their landlord has issued a no-cause notice.

3.4     Typically, a family will request a move voucher after they decide to terminate their rental agreement or after they receive a notice of termination from their landlord. Tenants must vacate their dwelling on or before the termination date stated in the notice or risk a legal eviction. If a family fails to secure a new dwelling prior to the termination date of their current tenancy, the family must either move in with friends or family, seek out space in a homeless shelter, or move into the family vehicle.

3.5     Federal regulations provide that participant families may move to another dwelling within a housing authority's district while retaining their voucher at least once per year at any time after the first year of tenancy. *See* 24 C.F.R. § 982.354.

3.6     Federal regulations also provide that participant families may port their voucher to a housing authority outside their current housing authority's district. Regulations further require that such requests to port outside the district be administered "promptly." *See* 24 C.F.R. § 982.353(b) and § 982.355(c).

3.7     MCHA's Administrative Plan provides that it will respond to requests for move vouchers within 10 business days and will issue vouchers to eligible HCV participants within 20 business days.

3.8     MCHA's Administrative Plan also provides that eligible HCV participants who request permission to port their voucher outside the district will receive a voucher "within 10 business days of the effective date of the unit termination."

3.9     Vouchers are, for many low-income families whose households benefit from a HCV Program, the most valuable thing they own. Many such families would be rendered

homeless without a voucher.

3.10    In recognition of the valuable property right conferred by a voucher, the Fourteenth Amendment to the United States Constitution, as well as federal regulations, require housing authorities such as MCHA to provide HCV participant families with due process before they are terminated from the HCV Program. This clearly established right to due process includes a right to constitutionally adequate notice and an opportunity to be heard. *See* 24 C.F.R. § 982.555(c).

3.11    Federal regulations provide that housing authorities may terminate families from the HCV Program only for causes specified by federal regulations. *See* 24 C.F.R. § 982.552.

### B.    Defendants Routinely Violate Due Process in Responding to Requests to Move

3.12    At all relevant times, defendants administered, and defendant MCHA continues to administer, vouchers for a group of approximately 1100 participant families in Marion County. Participant families are entitled to move with continued voucher assistance or to port to another district after their first year of tenancy. Participant families are also entitled to due process protections before they are terminated from the HCV Program. But participants are currently at risk of having their freedom to move arbitrarily denied by MCHA's policy of refusing to supply move vouchers until after the family vacates their current rental unit.

3.13    In July and August of 2016, defendant Wilkins-Ehenger stated to plaintiff Huff's prior counsel that MCHA's policy was to withhold move vouchers from participant families until after the families vacated their current dwelling. Ms. Wilkins-Ehenger explained that waiting to respond to voucher requests until after participants moved out of their current housing allowed MCHA to determine whether the participant family had damaged the dwelling or incurred debts to the landlord during the tenancy. If so, MCHA could terminate the participant family from the

HCV Program rather than providing them with a move voucher.

3.14    No such policy is included in MCHA's Administrative Plan; indeed, the Plan states that MCHA will respond to requests for move vouchers within the district in no more than 10 business days.

3.15    Ms. Wilkins-Ehenger has subsequently denied that she or MCHA maintained such a policy.

3.16    MCHA has subsequently acknowledged that, until at least November 8, 2017, it did in fact maintain a policy of refusing to issue move vouchers to eligible HCV participants until after the participant family moved out.

3.17    In 2016, defendants received approximately 49 requests for move vouchers (both within and outside the district). Of those 49 requests, defendants eventually provided vouchers to 36 of the participant families that would allow the families either to move within the district or to port to another district.

3.18    In its responses to 24 of the completed requests — approximately 66% — defendants issued a move voucher after the termination date of the previous tenancy. Defendants issued a voucher on the same day that the tenancy terminated in response to 3 — approximately 8% — of the requests. As a consequence, the 24 families could not secure a new dwelling until they had already vacated their previous dwelling.

3.19    In 2016, therefore, defendants denied three quarters of the participant families who requested move vouchers the ability to search for a new home until after they had moved out of their current home.

3.20    As Director of MCHA, Ms. Wilkins-Ehenger provided final approval for all move vouchers during her tenure at MCHA.

---

8 – SECOND AMENDED COMPLAINT

3.21     As a result of defendants' policy, the majority of participant families would be without stable housing between the conclusion of one tenancy and the beginning of another. Only 25% of requests for move vouchers in 2016 were honored prior to the date on which the participant families were required to move out of their current rental unit.

3.22     Ms. Wilkins-Ehenger has stated that the rental vacancy rate in rural Marion County is less than 1%. The low vacancy rate means that participant families experience significant difficulty in locating new dwellings. Ms. Wilkins-Ehenger has stated that, of the 700 vouchers issued in 2015, fewer than 200 participant families were able to find a place to live. Accordingly, MCHA's policy of delaying issuing move vouchers until after tenants move out significantly increases the risk that participant families like Ms. Huff and Ms. Blakely will suffer homelessness, a risk that was known to Ms. Wilkins-Ehenger.

3.23     As noted above, MCHA's Administrative Plan states that MCHA will respond to requests for move vouchers within the district in no more than 10 business days, will issue vouchers within 20 business days, and will fulfill requests to port outside the district within 10 business days.

3.24     In 2016, defendants issued half of the requested vouchers more than 20 business days after they were requested. Some participant families waited more than 60 business days before receiving their move vouchers.

3.25     In all, in 2016 defendants failed to provide 24 participant families with move vouchers prior to termination of their tenancies. Ms. Huff's family was one of those 24 families. Defendants also failed to provide 18 participant families with vouchers within the 20 business days specified by MCHA's Administrative Plan. Ms. Huff also was not provided with a voucher within 20 days.

3.26    The move request statistics for 2016 indicate that defendants refused to provide move vouchers prior to the termination of a tenancy approximately 75% of time.

### C.  Defendants Routinely Violate Due Process in Issuing Notices of Termination

3.27    Termination notices are issued by individual MCHA caseworkers, who were supervised by Ms. Wilkins-Ehenger during her tenure as Director of MCHA. Ms. Wilkins-Ehenger reviewed notices issued by caseworkers and on occasion issued notices that carried her own signature.

3.28    In 2016, MCHA caseworkers issued notices of termination from the HCV Program to 33 participant families based on allegations that family members had violated MCHA rules or federal regulations. Eleven notices did not provide 30 days' notice prior to termination as required by MCHA's Administrative Plan; one did not specify a reason for the termination (other than a recital of the number of the rules alleged to have been violated); and eleven failed to provide an adequate reason or an adequate notice period.

3.29    Accordingly, MCHA caseworkers failed to provide even minimal due process protections in approximately 69% of the termination notices that MCHA issued in 2016.

3.30    Of the notices that failed to provide an adequate notice period, twelve were issued after the date the termination became effective. Eight took effect before the expiration of the ten business days provided for participant families to request a hearing prior to the termination. Accordingly, twenty of the families terminated from the HCV Program in 2016 — approximately 60% — were effectively denied the opportunity to request a hearing prior to their termination.

3.31    In addition, twelve of the notices failed to specify a factual reason for the termination (other than a reference to the number of the rule alleged to have been broken) or to

supply a date on which the alleged violations occurred. As a result, 36% of the families

terminated from the HCV Program in 2016 were denied the opportunity to meaningfully

challenge their terminations because they had no way of knowing the factual basis for the

allegations.

3.32    The termination statistics for 2016 indicate that defendants failed to provide

adequate notice and an opportunity to be heard approximately 69% of the time. These statistics

show a consistent policy or practice whose effect is to deny due process to participant families

when attempting to terminate families from the HCV Program.

3.33    Based on defendants' actions in 2016, participant families, including Ms. Huff

and Ms. Blakely, remain at risk of being terminated from the HCV Program without an

opportunity to contest the termination.

**D.    Defendants' Denials of Due Process to Heather Huff and Risk of Future Denial**

3.34    Heather Huff is the head of her household. Her family has participated in the

HCV Program since 2002.

3.35    From 2010 to 2016, Ms. Huff rented a duplex in Stayton, Oregon.

3.36    In March 2016, Ms. Huff's landlord sent her and MCHA a notice terminating Ms.

Huff's tenancy without cause effective May 20, 2016. The landlord informed Ms. Huff that he

was terminating Ms. Huff's tenancy in order to extensively remodel the unit.

3.37    Ms. Huff contacted MCHA to request a move voucher on April 25, 2016. MCHA

staff informed Ms. Huff and her landlord that Ms. Huff's tenancy could not be terminated

without cause. This was untrue. Ms. Huff's tenancy was month to month and therefore could be

terminated without cause by either landlord or tenant.

3.38    MCHA staff did not respond to Ms. Huff's request for a move voucher in writing

as provided by MCHA's Administrative Plan.

3.39    In response to MCHA's claim that the landlord could not terminate Ms. Huff's tenancy without cause, the landlord issued Ms. Huff a notice of termination for cause effective June 9, 2016.

3.40    On June 1, 2016, MCHA staff issued Ms. Huff a notice stating that her family would be terminated from the HCV Program effective June 9, 2016. The notice was titled "Notification of Move Out" and consisted of a series of boxes to be checked by MCHA staff. MCHA staff checked the box for "MCHA TERMINATION OF PROGRAM PARTICIPATION." The sole reason provided for termination was "DUE TO EVICTION BY LANDLORD." As of June 1, 2016 (or June 9, 2016), Ms. Huff's landlord had not evicted her.

3.41    A housing authority may terminate a family's participation in the HCV Program only for reasons specified in 24 C.F.R. 982.552 or 982.553. A landlord's decision to terminate a tenancy is not sufficient cause for a housing authority to terminate a participant family from the HCV Program unless the housing authority determines that the landlord's reasons for terminating the tenancy constitute "serious or repeated lease violations."

3.42    The June 1, 2016 notice did not state any serious or repeated lease violations as cause for termination.

3.43    The notice also stated that Ms. Huff could inquire about the reason for her termination, and that she could request a hearing to dispute the termination within ten business days of the date of the notice. The ten business days provided by the notice gave Ms. Huff until June 15, 2016 to request a hearing prior to the termination. However, the June 9, 2016 effective date of the termination occurred nearly a week before Ms. Huff's opportunity to request a hearing prior to termination expired.

3.44    On June 1, 2016, Ms. Huff requested a hearing from MCHA on its decision to terminate her from the HCV Program. On June 2, 2016, after reviewing the June 1 notice, Ms. Wilkins-Ehenger sent an email to Ms. Huff's MCHA caseworker instructing the caseworker that Ms. Huff could not be terminated from the HCV Program until she was legally evicted.

3.45    Ms. Wilkins-Ehenger did not inform the caseworker that the notice period provided in the June 1, 2016 notice was insufficient or that eviction was not a sufficient cause for termination from the HCV Program unless the eviction was for a serious violation of the lease.

3.46    On June 13, 2016, Ms. Huff's landlord filed an eviction complaint. On June 21, 2016, Ms. Huff stipulated to an agreement with her landlord that she would move out on or before July 15, 2016 in return for dismissal of the eviction complaint. Ms. Huff complied with the stipulated agreement. Accordingly, Ms. Huff was not evicted.

3.47    On July 6, 2016, MCHA staff issued another notice of termination to Ms. Huff, this time with an effective date of July 15, 2016. The ten-day window for requesting a hearing on this notice would not expire until July 20, 2016.

3.48    The July 6 notice stated as cause for termination from the HCV Program "Violation of Family Obligations, see below." In another section, the notice listed four numbered family obligations (numbers 7, 9, 13, and 16) but did not explain how or when Ms. Huff had allegedly violated those obligations.

3.49    On July 13, 2016, Ms. Huff, through her then-counsel, sent a letter to MCHA via fax and first class mail, disputing the July 6 termination and requesting a hearing.

3.50    On July 19, 2016, Ms. Wilkins-Ehenger sent an email to Ms. Huff's caseworker stating that "Her attorney is seeking information and I have to provide information that is based upon our policies."

3.51    Ms. Wilkins-Ehenger did not inform the caseworker that the notice provided an insufficient period to request a hearing or that the notice did not provide a sufficient cause for termination.

3.52    Neither Ms. Wilkins-Ehenger nor the MCHA caseworker ever responded to the July 13 letter from Ms. Huff's counsel.

3.53    Neither Ms. Wilkins-Ehenger nor the MCHA caseworker scheduled a hearing for Ms. Huff.

3.54    Neither Ms. Wilkins-Ehenger nor the MCHA caseworker provided Ms. Huff with the move voucher she had been requesting since April 25, 2016.

3.55    Ms. Wilkins-Ehenger orally informed Ms. Huff's then-counsel that MCHA's policy was to withhold move vouchers until a participant family's landlord had confirmed that the rental unit had not been damaged and that tenants owed no balance to the landlord. No such policy is stated in MCHA's Administrative Plan.

3.56    Ms. Huff vacated her rental unit on July 15, 2016.

3.57    Because she had not received a move voucher, Ms. Huff could not afford housing. Ms. Huff's family therefore became homeless.

3.58    Ms. Huff sent her children to live with her parents in another town while Ms. Huff slept on friends' couches or in her car.

3.59    On August 8, 2016, Ms. Huff's then-counsel sent another letter to Ms. Wilkins-Ehenger, again by fax and mail. Ms. Huff's counsel informed Ms. Wilkins-Ehenger that Ms. Huff's family was now homeless and renewed Ms. Huff's request for a move voucher.

3.60    Defendants provided no written response to Ms. Huff or her counsel.

3.61    On September 22, 2016, the Oregon Law Center contacted defendants to protest

defendants' policy of denying move vouchers to participant families until they moved out of their rental units. The letter stated that the policy did not comply with federal regulations or MCHA's Administrative Plan and demanded that defendants immediately cease from enforcing the policy, retrain their employees, and provide move vouchers to all eligible participant families who had requested them.

3.62    On October 10, 2016, Ms. Wilkins-Ehenger issued a move voucher to Ms. Huff. This was 117 business days after Ms. Huff's initial request, and almost 3 months after she had vacated her previous unit.

3.63    At no time have defendants explained their actions or the delay.

3.64    Defendants never held the requested hearing on Ms. Huff's termination from the HCV Program, but no further steps were taken to terminate Ms. Huff's assistance on the basis of the July 6, 2016 termination notice.

3.65    Because of defendants' actions, Ms. Huff has been subjected to fear, stress, humiliation, and frustration in her ongoing efforts to secure stable, affordable housing for her family.

3.66    Defendants' refusal to provide Ms. Huff with a move voucher caused Ms. Huff and her family to become homeless. Ms. Huff incurred costs associated with lost belongings in the upheaval following her loss of housing.

3.67    Defendants' refusal to provide Ms. Huff with a move voucher also caused Ms. Huff to be separated from her children for almost six months. This experience was devastating for Ms. Huff. She feared that she would never be reunited with her children and have the opportunity to live as a family. She also feared that the separation would cause the children emotional and psychological harm and felt that she had failed to be a good mother to her

children. As a result, Ms. Huff experienced severe emotional harm including depression, fear, anxiety, and sleeplessness.

3.68    As set forth above, Ms. Huff's experience requesting a move voucher from defendants was not unique. Defendants have employed a policy or practice of refusing to timely issue move vouchers, with the predictable result that participant families experience housing instability and as a result risk homelessness, loss of employment opportunities, family break-up, and physical harm.

3.69    If Ms. Huff's current landlord issues a no-cause notice terminating her tenancy, as her prior landlord did, Ms. Huff will once again be subject to defendant MCHA's policy or practice of mishandling and refusing to issue a move voucher and once again at risk of significant harm as a result of defendant MCHA's policy or practice.

3.70    Likewise, defendant MCHA has a policy or practice of issuing termination notices, like those received by Ms. Huff, that do not afford participant families due process.

3.71    Ms. Huff also lives with the threat that defendant MCHA will again attempt to terminate her from the HCV Program without providing notice or an opportunity to request a hearing prior to termination.

3.72    As a result, Ms. Huff lives under constant threat of homelessness and separation from her family. She fears homelessness and family separation daily.

### E.  Defendant MCHA's Denials of Due Process to Terry Blakely and Risk of Future Denial

3.73    Ms. Blakely has participated in the HCV Program since 2005. She currently rents an apartment in Stayton, Oregon.

3.74    On October 3, 2017, MCHA staff issued Ms. Blakely a notice stating that she would be terminated from the HCV Program effective October 3, 2017 — the same date that the

notice was issued. The notice was titled "Notification of Move Out." The notice contained

several boxes. MCHA staff had checked the box for "MCHA TERMINATION OF PROGRAM

PARTICIPATION." The notice stated the following for "Termination Reason": "Violation of

Family Obligations: #6. Allowing MCHA inspection. The family must allow MCHA to inspect

the unit at reasonable times and after reasonable notice. Tenant was sent (2) letters regarding

inspection. Both times tenant was not present in the home."

  3.75 The notice did not state the dates on which the alleged letters were sent or any

other facts that would allow Ms. Blakely to challenge the allegation that she was sent letters regarding

inspection and was not home on the dates alleged.

  3.76 Ms. Blakely only received one letter from MCHA regarding an inspection.

  3.77 A housing authority may terminate a family's participation in the HCV Program

only for reasons specified in 24 C.F.R. § 982.552 or 982.553. One permissible reason for

terminating a participant from the HCV Program is a violation of a family obligation as defined

in 24 C.F.R. § 551. Failure to be present for an inspection is not a violation of a family obligation

as set out in 24 C.F.R. § 982.551. Therefore, not being home at the time of an inspection — the

cause stated for termination in Ms. Blakely's notice — is not a cause for termination from the

HCV Program.

  3.78 The notice also stated that Ms. Blakely could inquire about the reason for her

termination, and that she could request a hearing to dispute the termination within ten business

days of the date of the notice. The ten business days provided by the notice gave Ms. Blakely

until October 18, 2017 to request a hearing prior to the termination. However, the October 3,

2017, effective date of the termination occurred two weeks before Ms. Blakely's opportunity to

request a hearing prior to termination expired.

3.79    Ms. Blakely's notice was inadequate and failed to provide Ms. Blakely with a meaningful opportunity to challenge the basis of the termination because it was issued on the day it was to go into effect.

3.80    The notice was also inadequate in that it specified an invalid cause for termination.

3.81    The notice was also inadequate in that it stated a factually incorrect cause for termination.

3.82    On October 10, 2017, Ms. Blakely submitted a written request for an informal hearing.

3.83    MCHA staff did not respond to Ms. Blakely's request for an informal hearing.

3.84    On October 17, 2017, Ms. Blakely, through her then-counsel, sent a letter to MCHA via email and first class mail, requesting contact to coordinate the date for Ms. Blakely's hearing before it was set.

3.85    On October 18, 2017, MCHA staff sent a letter to Ms. Blakely informing her of her housing inspection on October 28, 2017.

3.86    The inspection was performed on October 28, 2017.

3.87    On November 1, 2017, MCHA staff sent Ms. Blakely a notice stating her assistance was no longer being terminated.

3.88    As a result of MCHA's insufficient notice, Ms. Blakely suffered fear, stress, anxiety, and sleeplessness based on fear that she would lose her housing and potentially become homeless. She continues to fear that if she fails to check her mail that MCHA will again attempt to terminate her from the HCV Program. Her fear of missing a notice from MCHA has limited her ability to travel or visit friends or family.

3.89    As set forth above, Ms. Blakely's experience receiving a termination notice is not unique. Defendant MCHA has employed a practice or policy of failing to provide adequate notices of termination from the HCV Program or an opportunity to challenge such termination, with the predictable result that participant families risk homelessness and physical harm.

3.90    As a result, Ms. Blakely lives under continuing threat of homelessness.

### IV. Plaintiffs Attempted to Resolve this Matter Prior to Litigation

4.1    The Oregon Law Center contacted defendants in September of 2016 to protest MCHA's policy of denying move vouchers until after participant families vacated their current rental.

4.2    Plaintiffs' counsel contacted defendants again on January 24, 2017, providing a draft of this complaint and providing notice of potential litigation.

4.3    Despite these efforts, the parties have not been able to resolve their dispute.

### FIRST CLAIM FOR RELIEF:
### Fourteenth Amendment to the U.S. Constitution (Procedural Due Process) and 42 U.S.C. § 1983

5.1    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

5.2    Because a voucher is a valuable property right, the due process clause and federal regulations require that housing authorities provide notice and an opportunity to be heard to HCV Program participants prior to terminating them from the HCV Program.

5.3    The due process requirements for terminations are clearly established in federal statutes and regulations.

5.4     Defendants' past practice, and defendant MCHA's current practice, of issuing notices of termination that (a) do not clearly identify that they are notices of termination from the HCV Program; (b) do not state a factual cause for termination; and (c) do not state a date or time on which any alleged violation of program rules occurred fails to provide procedural due process before depriving participant families of a property right. Families who receive such notices are not reasonably apprised of the cause for the state action and therefore have no opportunity to prepare a defense against the deprivation.

5.5     Defendants' past practice, and defendant MCHA's current practice, of issuing notices of termination after the effective date of the termination deprives participant families of a property right without due process because families who receive such notices are denied the opportunity to be heard prior to the deprivation.

5.6     Defendants' past practice, and defendant MCHA's current practice, of issuing notices of termination with effective dates that fall prior to the expiration of the 10 business days provided in which to request a hearing deprives participant families of a property right without due process because families who receive such notices are denied the opportunity to be heard prior to the deprivation.

5.7     Defendants' past practice, and defendant MCHA's current practice, of refusing to issue move vouchers until after participant families vacate their dwellings effectively deprives participant families of a property right without due process because families are denied the opportunity to move without being afforded notice of that denial or an opportunity to contest the denial through a hearing.

5.8     Plaintiffs have a real and immediate threat of injury without injunctive relief. If MCHA decides to terminate them from the HCV Program, MCHA's policies and practices mean

that plaintiffs will likely not be informed of the cause for the termination or provided with an opportunity to be heard prior to the termination. Similarly, if in the future MCHA chooses to withhold a move voucher, as it did for Ms. Huff, plaintiffs will have no opportunity to challenge MCHA's decision.

5.9     Plaintiffs are entitled to injunctive and declaratory relief, as set forth below.

5.10    Plaintiffs are entitled to their reasonable costs and attorney fees on this claim pursuant to 42 U.S.C. § 1988.


## SECOND CLAIM FOR RELIEF:
### Fourteenth Amendment to the U.S. Constitution (Substantive Due Process) and 42 U.S.C. § 1983

6.1     Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

6.2     The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

6.3     Federal regulations require that HCV Program participants be provided the freedom to choose where they live and the liberty to move from dwelling to dwelling while retaining the valuable property right secured by the participant family's voucher.

6.4     By refusing to respond to participant families' requests for move vouchers until after families move out of their dwellings, defendants have knowingly placed, and continue to place, participant families at substantial risk of becoming homeless and the serious harm — including threats to physical safety, as well loss of property and income — associated with homelessness. Defendants' policy poses an objective threat to participant families' fundamental

rights to physical safety and security, to the liberty to choose where they live, and to property and income.

6.5     Any reasonable official would be aware of the substantial risk of homelessness created by defendants' policy of denying move vouchers to participant families until after they vacate their dwellings. In particular, any reasonable official whose agency is tasked with providing housing to low-income families would be aware of the risks to physical health and safety, emotional wellbeing, and financial stability posed by a loss of housing.

6.6     Defendants were aware of the low rental vacancy rates in Marion County and of the difficulty that participant families experience when attempting to find new housing. Defendants have nonetheless pursued a policy that has the objectively predictable result of rendering families homeless.

6.7     Ms. Wilkins-Ehenger persisted in her refusal to respond to Ms. Huff's repeated requests for a move voucher, even after being informed that Ms. Huff's family was homeless as a consequence of defendants' failure to act. Only after receiving notice in September 2016 that litigation could result from defendants' actions did Ms. Wilkins-Ehenger issue a move voucher to Ms. Huff.

6.8     Defendants have acted with deliberate indifference or reckless disregard to the rights of participant families in employing the above-described policy.

6.9     No reasonable justification or legitimate governmental objective exists for defendants' policy of refusing, in violation of MCHA's Administrative Plan, to provide move vouchers to families who request them.

6.10    Defendants' employment of a policy that places all participant families who exercise their right to move at significant risk of homelessness and the risks of harm associated

with homelessness shocks the conscience. This policy violates participant families' rights to substantive due process as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6.11    The due process clause also requires that HCV Program participants receive notice and the opportunity to be heard before they are terminated from the HCV Program. Families who are terminated without notice lose the opportunity to contest the basis for their terminations.

6.12    MCHA staff habitually issue termination notices that do not comport with due process, either because the notices lack a specified cause for termination, an adequate time period in which to request a hearing, or both. As a consequence, a significant proportion of participant families are terminated from the HCV Program without being afforded due process by defendants.

6.13    Ms. Wilkins-Ehenger was aware of the deficiencies of termination notices issued by MCHA staff. Despite this awareness, Ms. Wilkins-Ehenger failed to take adequate steps to prevent or correct MCHA staff's failure to comply with due process requirements.

6.14    Defendants have represented that MCHA has no training policies or manuals other than its Administrative Plan.

6.15    Defendants' knowing failure to adequately train or supervise its staff to ensure that participant families' due process rights will be safeguarded when MCHA takes steps to terminate the families from the HCV Program amounts to a policy of deliberate indifference to those rights. Defendants' deliberate indifference to staff conduct that is substantially certain to result in the deprivation of due process to participant families shocks the conscience. Defendants' failure to train its staff violates participant families' rights to substantive due

process as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6.16    Plaintiff Huff suffered economic and emotional harm because of defendants' violations of her rights to substantive due process, including fear, humiliation, anxiety, depression, and sleeplessness, as well as lost wages, lost property, and other expenses associated with homelessness.

6.17    Plaintiff Blakely suffered emotional harm because of defendant MCHA's violations of her rights to substantive due process, including fear, stress, anxiety, and sleeplessness. She continues to suffer ongoing fear and uncertainty, as well as a reluctance to travel or visit family lest she miss an appointment and again be threatened with termination from the HCV Program.

6.18    Plaintiffs have a real and immediate threat of injury without injunctive relief. If they choose to exercise their right to move to another dwelling, they are likely to be denied a move voucher and thereby suffer future harm. If MCHA issues additional notices purporting to terminate plaintiffs from the HCV program, plaintiffs are unlikely to be provided with adequate notice of the cause for the termination or with the opportunity to be heard.

6.19    Plaintiffs are entitled to injunctive and declaratory relief, as set forth below.

6.20    Plaintiffs are entitled to their reasonable costs and attorney fees on this claim pursuant to 42 U.S.C. § 1988.

# V. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for:

1. A declaration that defendants' acts and omissions violated and continue to violate the Fourteenth Amendment to the U.S. Constitution;

2. An injunction requiring defendant MCHA to:

   a.    Immediately cease its policy of withholding move vouchers until after participant families vacate their dwellings;

   b.    Provide move vouchers to all eligible participant families within 20 business days of request as provided by the MCHA Administrative Plan, or, if MCHA determines it has cause to deny the request, issue written notice of the denial and inform the participant family of their right to a hearing on the denial;

   c.    Provide constitutionally adequate notices prior to termination of participant families from the HCV Program. Notices must state the program rule alleged to have been violated, a factual description of the conduct that allegedly violated the rule, and must include the date on which the alleged violation occurred. Notices must also provide an adequate opportunity for participant families to request a hearing prior to the termination;

   d.    Revise the Administrative Plan to remove the text requiring a participant family member to be physically present during an inspection, in compliance with HUD regulations;

3. As to plaintiff Heather Huff, an award of damages from all defendants in an amount to be determined at trial, but no less than $150,000;

4. As to plaintiff Terry Blakely, an award of damages from defendant MCHA in an amount

to be determined at trial, but no less than $50,000.

5. An award of reasonable attorney fees, costs and disbursements incurred herein;

6. Prejudgment interest; and

7. Such other and further legal and equitable relief as this Court deems just and proper.


DATED: <u>January 10, 2018</u>

Respectfully submitted,


<u>s/Emily Rena-Dozier  </u>
Emily Rena-Dozier, OSB #134674
emily.rena-dozier@lasoregon.org
Legal Aid Services of Oregon
520 SW 6th Avenue, Suite 700
Portland, OR 97204
(503) 471-1162
Fax: (503) 295-9496


Of Attorneys for Plaintiffs
